United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUSAN MCLAREN,
Plaintiff,

v.

ANDREW SAUL,
Defendant.

Case No. 18-cv-00739-JCS

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 21

## I. INTRODUCTION

Plaintiff Susan McLaren brings this action appealing the final decision of Defendant Andrew Saul, Commissioner of Social Security (the "Commissioner"),[1] denying McLaren's application for disability benefits. The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5. For the reasons discussed below, McLaren's motion is DENIED and the Commissioner's motion is GRANTED.[2]

## II. BACKGROUND

### A. Plaintiff's Medical History

Susan McLaren is a 57-year-old woman with a master's degree in Industrial Organizational Psychology and an RN license. Administrative Record ("AR," dkt. 13) at 35. McLaren, a nurse, sustained a back injury on October 26, 2009 when an obese patient fell on top of her as she lifted the patient off the commode to a crash cart. *Id*. at 340, 344. She stopped working on August 2, 2011, *id*. at 283, and did not engage in substantial gainful activity ("SGA") between then and December 31, 2013, the end of her alleged period of disability. *Id*. at 944. She alleges disability

[1] Andrew Saul was confirmed as Commissioner while this action was pending and is therefore substituted as the defendant as a matter of law. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

due to "torn rotator cuff-shoulder, back injury, bilateral knees; left hip fracture and severe osteoarthritis; left rotator cuff tear, impingement, tendonitis; 5 blown out disks lumbar-back, severe osteoarthritis; bilateral knee injuries." *Id*. at 62.

On October 30, 2009, a few days after the accident, McLaren saw her primary treating physician Dr. M. Michael Mahdad. He wrote:

> The patient is complaining of continuous left shoulder pain; she cannot lift that arm up. She reports intermittent numbness in the left arm; neck pain, especially when she turns her head to the sides.
>
> The patient has low back pain & stiffness. She complains of bilateral knee pain, especially under the knee-caps . . . .
>
> . . .
>
> IMPRESSION
>
> 1. Left shoulder sprain; possible rotator cuff syndrome or impingement syndrome.
>
> 2. Cervical sprain/strain, with left cervical radicular symptoms.
>
> 3. Lumbar strain.
>
> 4. Bilateral knee sprains.
>
> . . .
>
> I do suggest for the patient to continue with Physical Therapy--to include her shoulder, neck and lumbar spine. She will continue with Naprosyn and muscle relaxants at this time.

*Id*. at 381–83. Dr. Mahdad noted in November of 2009 that McLaren's back pain, knee pain, and arm paresthesia were improving with physical therapy but indicated that McLaren's "main concern and complaint remains the left shoulder; at times, there is a jabbing pain in the shoulder, and she has trouble with movements of that arm—especially at-or-above-shoulder level." *Id*. at 379. On December 14, 2009, McLaren underwent an MRI that revealed "Rotator cuff tendinitis and/or incomplete under surface tear" and "Hypertrophic AC joint degenerative change with impingement morphology." *Id*. at 385.

McLaren reported to another doctor that in January of 2010, she saw Dr. Scott Fisher, an orthopedic surgeon at St. Joseph Hospital, who reviewed the MRI and told McLaren that her arm was "inoperable due to the inflammation and the limited range of motion." *Id*. at 351. She then

underwent "a second course of therapy to the left shoulder 2-3 times per week at St. Joseph Hospital, per Dr. Mahdad's recommendation." *Id*.

Dr. Steven Silbart, a medical examiner working in connection with McLaren's workers' compensation claim, physically examined McLaren on February 23, 2010 and found 5/5 muscle strength with intact sensation and reflexes. *Id* at 356. McLaren expressed "discomfort with deep palpation" in her cervical spine, her left shoulder, the thoracolumbar spine, and her left knee. *Id*. at 355–58. The examination found "no evidence of fracture or dislocation" in any of the places where McLaren reported having pain. *Id*. at 359. Dr. Silbart diagnosed McLaren with "cervical spine, left shoulder, thoracolumbar spine, bilateral knee strain, [and] Impingement Syndrome left shoulder." *Id*. at 360. McLaren noted that her right knee pain "resolved" and that her left knee pain was "intermittent" and "moderate in degree." *Id*. at 355. On a self-reported pain severity questionnaire that same day, McLaren reported that her current pain was a two out of ten and her average daily pain was two or three out of ten, that it was "[i]mpossible to lift 10 pounds," and that her pain "[d]oes not restrict ability to sit for 1/2 hour." *Id*. at 363. She answered eight out of ten when asked whether her pain interfered with her daily activities. *Id*.

Dr. Mahdad examined McLaren again in March of 2010 and noted a "left shoulder inflammatory process–most likely tendinopathy; possible partial rotator cuff tear, per MRI scan." *Id*. at 371. After a visit in October of 2010, Dr. Mahdad recorded an impression of "1. Lumbar sprain[;] 2. Bilateral knee sprains[; and] 3. History of left shoulder tendinopathy." *Id*. at 366.

In December of 2010, McLaren completed a different pain questionnaire as part of her initial application for benefits. *Id*. at 231–34. She indicated that she was taking Naproxen and Motrin "when desperate." *Id*. at 232. These medications relieved the pain for an hour, but caused her to suffer "GI distress, nausea." *Id*. at 232–33. She also used ice packs and heat to relieve the pain. *Id*. at 233. When asked if any surgery was scheduled, she wrote that surgeons were "unable to operate on [left] shoulder, to [sic] much inflammation, damage." *Id*. McLaren described "difficulties with walking or sitting to [sic] much." *Id*. at 233–34. "Activities are limited," she wrote, but she could do some activities on some days for "15 minutes or more." *Id*. She reported that she was "able to do errands such as going to the Post Office or grocery store without

assistance" and was "able to do light housekeeping chores (i.e. dusting, cooking, etc.) without assistance." *Id*. at 234. She could walk, stand, and sit for fifteen minutes at a time. *Id*.

McLaren reported an allergic anaphylactic reaction to ibuprofen on February 19, 2011. *Id*. at 497. She did not report any dizziness during that time. *See generally id*. at 497–525.

Meanwhile, McLaren was undergoing physical therapy. On December 17, 2010, her physical therapist summarized: "[p]atient states pain level has decrease [sic] with PT intervention. Pain is at a low of 2/10. Pain level can reach to 7/10 at times." *Id*. at 531. McLaren later reported back pain and spasms "with trying to tie her shoes and with walking fast and prolonged walking." *Id*. at 540, 543.

Between November of 2010 and April of 2011, McLaren reported that her "[l]umbar back injury became worse, resulting in gait disturbance involving (R) foot." *Id*. at 258. She said that her pain made her "unable to work, difficulty with tyingshoes [sic], bending over, sitting, standing, and walking for extended periods of time." *Id*. at 261. On an exertional questionnaire, McLaren reported that she could drive "20–30 minutes, but generally 10–20 minutes." *Id*. at 266. She went grocery shopping weekly and carried a ten- to fifteen-pound bag of groceries to her car. *Id*. She also noted that she "had an anaphalactic [sic] allergic reaction to Motrin 12/10/2010" and was "[u]nable to take pain meds or anti-inflammatory at this time." *Id*. at 267. She further documented difficulty walking: "I would like to walk daily but am unable to do so. If I walk around the neighborhood I [illegible] pain before, during, & after. I wake up at night with L knee pain, that can persist for days." *Id*. at 265.

An August 5, 2011 MRI[3] of McLaren's lumbar spine revealed "[m]oderate multilevel lumbar spondylosis[4] and degenerative disk disease, resulting in varying degrees of spinal canal or neural foraminal stenosis."[5] *Id*. at 828. On August 22, 2011, McLaren returned to Dr. Mahdad,

---

[3] The original copy of the MRI report is not included in the record but is summarized by Dr. Silbart, AR at 828, and Dr. Mahdad, *id*. at 555.

[4] "Spondylosis is 'ankylosis of a vertebral joint.' Ankylosis is 'immobility and consolidation of a joint due to disease, injury, or surgical procedure.'" *Huffman v. Shinseki*, No. 07-3375, 2010 WL 1232452, at *1 (Vet. App. 2010) (internal citations omitted) (citing Dorland's Illustrated Medical Dictionary 1780 (31st ed. 2007)).

[5] Stenosis is compression of spinal nerve roots. *See Hill v. Colvin*, No. 2:13CV637, 2015 WL 459186, at *8 (E.D. Va. Feb. 2, 2015) ("In lumbar stenosis, the spinal nerve roots in the lower



United States District Court
Northern District of California

who described an MRI of her lumbar spine as indicating some disc protrusion along with "mild spinal canal stenosis and mild-to-moderate, bilateral neural foraminal stenosis." *Id*. at 555. Dr. Mahdad wrote, "**The patient is <u>not able</u> to perform her work duties as a Nurse, due to her low back symptoms, and she is considered <u>Temporarily Totally Disabled</u>.**" *Id*. at 556 (emphasis in original).

On October 9, 2011, Dr. Bhatia, an orthopedic spinal surgeon at UC Irvine, wrote that McLaren reported "good improvements" with "conservative treatment" but that she was now experiencing "tingling sensation in her legs bilaterally . . . . This happened twice while she was walking." *Id*. at 628. On their next visit on October 27, 2011, he documented that McLaren's pain got worse after a physical therapist placed her in traction. *Id*. at 650. "If her symptoms do not improve," Dr. Bhatia wrote on November 8, 2011, "she may need to undergo surgical intervention for an L5-S1 posterior spinal fusion." *Id*. at 647.

On November 7, 2011, McLaren underwent a third MRI which indicated some disc tears and bulging but overall found "no significant spinal stenosis and other areas of the neural canals are normal. Direct comparison with the previous study of 08/05/2011 shows no change." *Id*. at 760–61. Nine days later on November 16, 2011, Dr. Mahdad noted that "patient's symptoms became worse after the traction of the lumbar spine" and that Dr. Bhatia had requested a third MRI. *Id*. at 559. Dr. Mahdad appears to have not been aware that the MRI had already occurred. *See id.* ("The repeat MRI scan of the lumbar spine <u>apparently</u> has now been authorized—just waiting for the <u>written confirmation</u>."). He added, "**The patient is <u>not able</u> to work at this time**." *Id*. at 560 (emphasis in original).

At a visit on April 12, 2012, Dr. Bhatia echoed his earlier assessment that McLaren might need surgery: "The patient may need to undergo surgical intervention for L5-S1 posterior spinal decompression interbody fusion instrumentation if her symptoms do not improve with conservative treatment." *Id*. at 644. McLaren's symptoms did improve. *See id*. at 641 ("Now she

---

back are compressed, or choked, and this can produce symptoms of sciatica—tingling, weakness or numbness that radiates from the low back and into the buttocks and legs—especially with activity." (quoting Charles D. Ray, M.D., *What is Spinal Stenosis?*, Spine–Health (Aug. 7, 2009), http://www.spine-heal th.com/conditions/spinal-stenosis/what-spinal-stenosis)).



United States District Court
Northern District of California

is walking approximately 30 to 40 minutes a day, which is much more than she was able to do previously. She is also seen by pain management service and was started on Lyrica and Lidoderm patches, which are helping a lot with her pain."). On July 24, 2012, Dr. Bhatia recorded that "the patient may need to undergo surgical interventions for lumbar fusion at L5-S1 sometimes [sic] in the future, but for now we will have her continued on conservative treatment." *Id*.

An April 12, 2012 x-ray of McLaren's hips and lumbar spine showed "minimal degenerative changes at L3/L4 and L5/S1." *Id*. at 757, 564. The report also noted degenerative changes in McLaren's hips which were "significantly worse on the left side," as well as imaging "suggestive of bone-on-bone contact" in the hip joint. *Id*. A second x-ray on July 18, 2012 revealed "mild generalized osteopenia" and "minor left hip superior joint space narrowing." *Id*. at 562, 668.[6] *Id.* Otherwise, the rest of the x-ray appeared "within normal limits." *Id*. The radiologist's overall impression was "[m]ild left hip osteoarthrosis." *Id*.

McLaren underwent a comprehensive pain management consultation on May 15, 2012 with Dr. Raif Iskander, DC, a chiropractor and physician's assistant, at Newport Beach Headache and Pain. *Id*. at 590–95. McLaren complained of seven out of ten left shoulder pain and five out of ten pain with radiation in her left knee. *Id*. at 590–91. She estimated "that her daily activities are limited at 80%." *Id*. at 591. She listed medications Singular, Synthroid, and Soma, and reported allergies to ibuprofen, prednisone, and sulfa. *Id*. at 592. Dr. Iskander noted arthritis in McLaren's left hip, as well as limb pain and disc dislocations. *Id*. at 593. McLaren reported "good results with Lyrica" and increased her dose. *Id*. at 596. The recorded "review of systems" indicated that she reported "no dizziness." *Id*. at 616. Her pain had also decreased to a five out of ten in both her shoulder and her knee. *Id*. at 596. On August 30, 2012, Dr. Iskander recorded that McLaren reported "no dizziness." *Id.* at 616.

McLaren also saw Dr. Daniel Oakes, an orthopedic surgeon. At their initial visit on July 18, 2012, Dr. Oakes wrote that, in his opinion:

> she does have end-stage degenerative joint disease of the left hip. I

[6] Osteopenia is the loss of bone mineral density, which often leads to osteoporosis. *See Colville v. Pharmacia & Upjohn Co., LLC*, 565 F. Supp. 2d 1314, 1316 (N.D. Fla. 2008).

> think the best treatment options [sic] is the left hip arthroplasty. She seems somewhat surprised that surgery would be a recommendation given her young age. In spite of her age, I think given her examination, history, and radiographic findings that she is best treated with an arthroplasty surgery when she feels that she is ready. . . . I have been happy to prescribe her outpatient physical therapy prescription to work on range of motion strengthening of the left hip.

*Id*. at 665. McLaren improved with physical therapy, leading Dr. Oakes to opine on October 17, 2012:

> At Ms. McLaren's initial consultation, I had felt that she was a candidate for a left total hip arthroplasty . . . . Fortunately, she has made strides with the therapist . . . .
>
> I again discussed with Ms. McLaren that she does have end-stage degenerative joint disease of the left hip. I think ultimate treatment would be a left total hip arthroplasty when she feels ready.

*Id*. at 658–59. Dr. Oakes ordered a follow-up x-ray that same day, which found mild left hip osteoarthrosis. *Id*. at 667.

Dr. Silbart examined McLaren a second time on September 4, 2012. He found that McLaren had discomfort and some decreased range of motion in her left hip, but that she was "able to sit comfortably with hip flexed to 90°" and had full muscle strength in her lower extremities and in both shoulders. *Id*. at 843–47. McLaren reported to Dr. Silbart that her physical therapy had been beneficial. *Id.* at 847.

McLaren underwent a multi-disciplinary physical therapy evaluation at Orange County Pain and Wellness on October 31, 2012. When asked described her daily routine, she replied "that she performs her physical therapy home exercise program for about 90 minutes every other day, and on alternate days walks on flat ground for 35–60 minutes. She stated that she is able to exercise on the elliptical machine for 20 minutes occasionally." *Id*. at 675. She stated that her pain "can vary from bad to just okay. She states that the pain level can get up to a 10 with increasing activity . . . . She cannot kneel, she cannot stoop, she cannot cross her legs, she cannot bend over fully at the waist without bending at the knees." *Id*. at 688. Her strength scores were all at least "3-" out of five with some scores at four or five out of five; however, the examiner noted that McLaren "did not seem to make much effort to resist examiner's pressure during muscle tests, even when asked repeatedly to do so." *Id*. at 676–77. She also "refused to allow the examiner to

passively flex her L hip . . . presumably to guard from the pain." *Id*. at 678. The examiner noted that McLaren "has high motivation to return to work, she demonstrates good potential to achieve a significantly higher level of functional capacity." *Id*.

An evaluator noted that McLaren:

> is a surgical candidate, but she has elected to not have the surgery performed since she is not convinced that she needs it nor has it been determined that it would change her conditions [sic] outcome if performed. . . .
>
> (4) The patient is not a candidate where surgery or other treatments would clearly be warranted.
>
> She is currently a surgical candidate in a sense that her orthopedic doctor suggested that she have surgery, but it is only optional. It was not recommended that she have surgery immediately and the option was hers for the choosing. She has chosen to not have any surgery at this time.

*Id*. at 689, 691. The evaluation indicated that McLaren was highly active before her injury, was unable to engage in outdoor activities after the injury, and was motivated to return to work but fearful that she might not be able to. *Id.* at 688, 691. The evaluator noted that McLaren was a very good candidate for the interdisciplinary Functional Restoration Program ("FRP").

McLaren completed another pain and symptom questionnaire on November 7, 2012. She wrote that the pain was brought on by "activity and sitting" and that rest relieved the pain "after a few hours." *Id*. at 317. She now reported that she was taking Lyrica and Flexeril daily and had been since May of 2012. *Id*. She said that both medications caused dizziness. *Id*. She tried using a TENS unit,[7] but it "was not helpful." *Id*. at 318. "Physical therapy is what always helps." *Id*. Her self-reported ability to walk varied between "good days" and "bad days," but she could stand up to half an hour and sit for up to forty-five minutes at a time. She wrote that she needed help with household chores and reported "difficulty with stooping, bending, squatting." *Id*. at 319. She also reported being unable to dust. *Id*.

---

[7] "A TENS unit is a non-invasive, drug-free, small electronic device comprising a base unit and four electrode pads connected to the base unit by thin wires. When activated, the TENS unit sends stimulating pulses across the surface of the skin, producing a tingling or massaging sensation to reduce the sensation of pain." *Walker v. Bonson*, No. 17-CV-234-BBC, 2018 WL 2452774, at *1 (W.D. Wis. May 31, 2018).



United States District Court
Northern District of California

McLaren started FRP on January 7, 2013 and successfully completed the program on February 9, 2013. *See generally id*. at 694–724 (records from FRP). During the program, she continued to see Dr. Bhatia, who reported that McLaren's pain surged on January 25, 2013 "to the point where she was not able to do the [FRP] exercises." *Id*. at 733–34. He further noted that "the patient appears to have had re-exacerbation of her back pain and left leg sciatica [and] may have suffered worsening disc herniation and nerve compression versus a severe lumbar strain," and that she was taking Norco and Lyrica and using Lidoderm patches. *Id*. at 734.

Meanwhile, the FRP physical therapist documented full participation and even improvement. *See id*. at 713–17. The physical therapist wrote that:

> Susan states that she is having a flare up in her lower back from doing some stretches . . . . She is reporting a flare up of the left lower back, buttock and leg pain. She states she went to Dr. Bhatia for evaluation and the PA told her that she 're-injured' her nerve. No intervention was recommended and she was told that it should resolve in 1-2 weeks. By Friday 2/1/13, she was already feeling much better.

*Id*. at 714. The physical therapist also noted that that McLaren's "[s]ymptoms and complaints seem to be magnified compared to diagnostic findings and exam findings." *Id*. at 720. The staff of FRP documented "slow progress in physical therapy" that led to McLaren "walk[ing] on the treadmill for 40 minutes." *Id*. at 719. McLaren also reported new "headache/neck pain radiating to upper extremities [and] tingling in fingers" on a disability appeal form dated March 29, 2013. *Id*. at 322. She reported using Lidoderm patches, Lyrica, and Robaxin, but did not report any side effects. *Id*. at 324.

Upon returning to Dr. Bhatia after completing FRP, McLaren reported that "[t]he training helped with the left hip and left shoulder overall pain." *Id*. at 730. However, he also noted that "she has had worsening neck pain, lower back pain and continued left leg sciatica," and that "[s]he continues to be quite disabled." *Id*. at 730–31.

Dr. R. May evaluated McLaren's medical record as part of her claim for disability insurance benefits on February 12, 2013. *Id*. at 62–72. Dr. May found McLaren "partially credible," writing that her statements, her daily activities, and the objective findings were not consistent, and that McLaren reported an ability to stand for only half an hour and a variable



United States District Court
Northern District of California

ability to sit. *Id*. at 69. While McLaren had some exertional limitations, Dr. May found that she could occasionally lift or carry 20 pounds, and frequently lift or carry 10 pounds. *Id*. She could sit and stand with normal breaks for "[a]bout 6 hours in an 8-hour workday." *Id*. In addition, while she had postural limitations, Dr. May found that McLaren could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, as well as balance, stoop, kneel, crouch, and crawl. *Id*. at 70. While her left overhand reaching was limited, Dr. May did not find that McLaren had any other manipulative limitations. *Id*. She was to avoid uneven terrain, concentrated exposure to extreme cold, and even moderate exposure to "[h]azards (machinery, heights, etc.)." *Id*. at 71. Ultimately, Dr. May concluded that McLaren could return to some form of light work, including her past work, and was not disabled. *Id*. at 72–73.

Dr. D. Chan reviewed McLaren's documents as part of her request for reconsideration on June 25, 2013. *Id*. at 75–89. Dr. Chan echoed Dr. May's finding of partial credibility. *Id*. at 84. Dr. Chan opined that McLaren was capable of sustaining light work and that her prior work experience was transferable, although she could not perform her past work. *Id*. at 88. Dr. Chan ultimately determined that McLaren "would still be capable of work activities" and was therefore not disabled. *Id*. at 89.

On October 28, 2013, Dr. Bhatia completed a Work/School Status report in which he cleared McLaren to return to work "with the following restrictions: No sitting or standing > 30 min to 1 hr.[;] No lifting, pushing, or pulling > 8–10 lbs[;] No repetitive twisting and bending." *Id*. at 935.

Dr. Bhatia reported on November 5, 2013 that McLaren suffered another setback:

> [D]oing different exercises with physical therapy, trying to push her limits and the next day had increased pain in the left buttock . . . . She reports that she was not able to lift her leg or dorsiflex her foot for a couple of days. . . . Currently she rates her pain as 7-8 on a scale of 1-10 and is made worse with prolonged sitting, lying down and sleeping . . . . . The patient reports that these symptoms are different than what she has had in the past and they feel much worse.

*Id*. at 938. Nevertheless, Dr. Bhatia reported that McLaren had 4/5 muscle strength in her lower left side. *Id*. Dr. Bhatia ordered another MRI, and noted that "radiographs of the lumbar spine obtained today shows worsening intervertebral disc disease of the lumbar spine at L5-S1 . . . .

There is back and disc phenomenon at this level with severe foraminal stenosis." *Id*. The MRI took place on November 19, 2013 and showed 2 to 3 mm disc bulges on L5-S1, L4-5, L3-4, L1-2, and T12-L1. *Id*. at 1164–65. The radiologist identified little to no change from the comparison MRI from November of 2011. *Id*. at 1165; *see also id*. at 760–761 (results of the MRI dated November 11, 2011).

After being forced to stop physical therapy due to insurance denial, McLaren again told Dr. Bhatia that her condition worsened on December 3, 2013. *Id*. at 1189.

McLaren submitted additional records beginning in 2014, but the Administrative Law Judge ("ALJ") Judge Markiewicz did not consider these medical records in his decision because they fall outside of McLaren's claimed period of disability. *See id*. at 951 ("[T]he undersigned finds these medical records are irrelevant in deciding this case, especially in light of the claimant's engagement in SGA beginning 2014.").

**B. Initial Denial of Application and Appellate History**

McLaren's injury occurred at work on October 26, 2009. AR at 232. She alleges an onset date of August 22, 2011 for a closed period of disability from August 22, 2011 to December 31, 2013. *Id*. at 944. She filed her initial application on September 5, 2012 alleging disabling "Disorders of the Back (Discogenic & Degenerative)." *Id*. at 55. Her claim was denied on February 10, 2011. *Id*. at 63. She filed for reconsideration, which was denied on June 3, 2011. *Id*. There was a hearing in front of Administrative Law Judge Helen E. Hesse, who heard testimony from McLaren, her attorney, a vocational expert, and a medical expert. *Id*. at 1037. Judge Hesse issued an unfavorable decision. First, she noted that she gave Dr. Bhatia's opinions "little weight" because they were internally inconsistent and because they were controverted by other doctor's assessments. *Id*. at 1043–44. She instead looked to the testimony of the medical expert and the state agency physician, Dr. Chan. *Id*. at 1044.

Judge Hesse also found McLaren "not fully credible":

> [T]he MRI in April 2012 showed only minimal degenerative changes of the lumbar spine at L3-4 and moderate narrowing of the disc space at L5-S1 without evidence of "blown out disks." The claimant also claims standing, walking, and sitting cause extreme pain. And yet, she was able to attend all the physical therapy sessions, which



United States District Court
Northern District of California

> presumably involve extensive standing and/or sitting to strengthen her mobility. In addition, despite her assertion of side effects of dizziness from Lyrica, the claimant requested Lyrica refills to her pain specialist. It would be reasonable to conclude that if the side effects are so severe, the claimant would have requested different pain medications . . . . And finally, in spite of her total inability to work, the claimant lives alone in her house and admits that she can carry 10-15 pounds of grocery bags weekly, indicating that her functional level is probably higher than what she alleges. Therefore, the undersigned finds the claimant only partially credible.

*Id*. at 1045 (internal citations omitted). Based on these findings, the ALJ determined that although McLaren could not perform her past work, she could perform other work and thus was not disabled. *Id*. at 1045–46.

McLaren's case was reviewed in the Central District of California by Magistrate Judge Kenly Kiya Kato. *Id*. at 1005. The district court reviewed Judge Hesse's decision to determine "[w]hether the ALJ improperly found Plaintiff less than credible." *Id*. at 1011. The court found that Judge Hesse had erred because she did not offer clear and convincing reasons for discounting McLaren's testimony. The district court did not address McLaren's second claim, that "the ALJ improperly weighed the opinion of Plaintiff's treating physician," because it found the credibility question dispositive. *Id.* The district court remanded the case for further proceedings so an ALJ could "reassess Plaintiff's credibility regarding her symptoms and their impact on the [residual functional capacity ("RFC")] determination." *Id*. at 1022.

### C. Administrative Hearing

On July 25, 2017, the parties attended a remand hearing before ALJ Alan J. Markiewicz in Orange, California. In addition to McLaren, a medical expert and a vocational expert testified during the hearing. Judge Markiewicz first heard from Dr. Dean Schmitter, a non-examining medical expert. His opinion was based on his review of the evidentiary record. AR at 966. Dr. Schmitter acknowledged that the record reflected "positive impingement signs of the left shoulder," but noted that, despite claims of pain in her knee, "the knee exam was normal." *Id*. at 966–67. He observed that x-rays showed "good range of motion" and indicated that McLaren's spine and shoulder were within normal limits, although spinal x-rays revealed "degeneration, L5/S region." *Id*. at 967. With respect to McLaren's shoulder, Dr. Schmitter summarized his diagnosis as "mostly, tendonitis," with 'no re-tear or physical as prescribed." *Id*. Dr. Schmitter

interpreted the references to potential hip surgery in the record, and that McLaren "'was not ready,'" as indicating that McLaren had "degenerative changes not severe enough to warrant recommendation for a total hip [replacement], at that time." *Id.*

Ultimately, Dr. Schmitter offered the following RFC:

> Maybe an eight-hour day. . . . Standing and walking, perhaps, four out of an eight-hour day. I don't see any limitations in sitting. In terms of push/pull, no major problems . . . . I think function in the overhead position on the left side would be impeded to occasional, because of what appears to be decreased motion and strength in the left shoulder. . . . [A]ctivities of daily living shouldn't be a major problem. In terms of functional, stairs and ramps beyond the frequent basis. I don't think she should be on ladders, ropes or scaffolds at all, because of her arthritic hip . . . . And all the other function would be on the occasional basis, at best, because, again, of her left hip arthritis. Environmental, they do better in warm weather than in cold weather. But otherwise, no major issues there. . . . Lifting and carrying, oh, in the light category, because of her hip and, perhaps, a little bit of the left shoulder. So 20 frequently, 10 occasionally would be probably appropriate.

*Id*. at 969–70. He added that McLaren's complaints of back pain were "not well substantiated objectively, in this record." *Id*. at 970.

McLaren's attorney confronted Dr. Schmitter with the MRI report from August 9, 2011. *Id*. at 971. In response, he conceded that "you could say well, there's some narrowing of pigment at the L3/4. So that would suggest the possibility of nerve root impingement. But that you have to match that up with a physical finding of that nerve root impingement . . . . I don't see any of that." *Id*. at 971–72. The attorney's reading of the MRI did not change Dr. Schmitter's assessment of McLaren's RFC, and Dr. Schmitter noted that some degree of degenerative change as indicated on the MRI would be typical for someone of McLaren's age. *Id*. at 969–70, 972.

The testimony then turned to pain management as McLaren's attorney pointed out that McLaren "has an inability to tolerate anti-inflammatories or cortisone injections. So obviously, her pain would be expected to be more severe than somebody who was able to rely on medication." *Id*. at 974. Dr. Schmitter replied, "I don't see that reported . . . . [A]bout 10/15 people can't tolerate continuous non-steroidal anti-inflammatories . . . ." *Id*. McLaren interrupted to assert that she has an "anaphylactic allergy" to anti-inflammatories, to which Dr. Schmitter replied "Anaphylaxis. I'm not sure what anaphylactic is. I've never heard of it." *Id*. at 974. He

pointed again to his reading of the record that "at least one doctor said she wasn't ready" for a total hip replacement. *Id*. at 975.

Judge Markiewicz then questioned McLaren. While he misstated that the prior decision was favorable to McLaren, he explained that "[t]he district court did remand the case April 28, 2016, and at that time, indicated problems with Judge Hess's [sic] – for example, talking about improvement – medical improvement in the decision, but the court questioned the improvement. And then the fact that claimant was involved in physical therapy, Judge Hess [sic] mentioned that, but the court was not especially impressed with that." *Id*. at 976. Judge Markiewicz confirmed that McLaren's condition had improved since the end of her closed disability period, partly due to physical therapy, and that she was working three days per week. *Id*. at 977–78. Judge Markiewicz asked McLaren to expand on the issues she claimed to have with taking pain medications. McLaren responded that she has "an anaphylactic allergy to Motrin, aspirin, and all cortical steroids," which "was confirmed by Dr. Susan Cocke, an allergy and asthma specialist, after [McLaren] went to the ER for an anaphylactic allergy." *Id*. at 978–79. Judge Markiewicz asked whether McLaren's allergy included an allergy to "morphine-based products." *Id*. at 979. McLaren replied, "No. I don't think so, but I'm not positive. I stayed away from everything because of the fact that I have an anaphylactic allergy." *Id*.

When Judge Markiewicz asked about the effectiveness of Botox injections, McLaren said that they had been somewhat helpful but that "the pain came back." *Id*. Judge Markiewicz assured her that he would give "full consideration" to her impairments before she was able to return to work. *Id*.

McLaren's attorney asked her to describe her daily activities during the time she was unable to work. She detailed her routine as follows:

> I would lie down with my leg up on the wall because of the pain that I had, radiating from the buttock area down into my foot and my toes. So my foot and toes would swell up. So I would have my legs up on the wall to try and help with the pain. I would soak my left foot in a turkey pan with ice, to bring down the numbness and the pain. I would alternate sitting and lying down with ice packs on my hip flexor area, a heating pad on the buttock area . . . with ice packs on my little hip flex areas to alleviate the hip flexor pain. . . . That was every day



United States District Court
Northern District of California

> and throughout the night I would have to ice packs, heat packs – things like that.

*Id*. at 980–81. McLaren reported that she was limited to picking up "a small bag of sugar or small bag of flour, something like that," which she estimated weighed five pounds. *Id*. at 981. She testified that she had a difficult time sitting for longer than twenty to thirty minutes, and had similar difficulty standing in a single spot. *Id*. at 982. She described walking as "agonizing" and reported not being able to dust, do yardwork, or clean the house where she lived alone. *Id*. at 982–83.

Finally, Judge Markiewicz questioned Kelly Winn, the vocational expert. He drew his first hypothetical from Dr. Schmitter's assessment of McLaren's limitations:

> [P]lease assume an individual who is currently age 55, and has a college education, and the work background of the claimant. . . . So lift and carry 20 pounds occasionally, 10 pounds frequently; standing/walking up to four hours in a eight-hour workday; sitting not limited . . . occasional overhead reaching with the upper left extremity. . . . Cannot climb ladders, rope or scaffolds; can frequently climb ramps and stairs; can do all the other postural activities occasionally. So that's like balance, stoop, kneel, crouch, crawl, I think it is. And then finally, the individual should avoid concentrated exposure to extreme cold.

*Id*. at 984–85. Based on that hypothetical, Winn opined that the person described could not do McLaren's past work and would be limited to unskilled work "at the light level," such as working as an "office helper." *Id*. at 985. Given that McLaren was forty-nine and a "younger individual" during part of the disability period, Judge Markiewicz amended the hypothetical to reflect the younger age. Winn responded that there were sedentary, unskilled jobs for such a person, like a "charge-account clerk." *Id*. at 986.

In the second hypothetical, Judge Markiewicz added limitations: "lifting and carrying would be a maximum of ten pounds. Standing and walking would be limited to one hour, total, in an eight-hour workday. Sitting would be limited to four hours, total, in an eight-hour workday." *Id*. Winn testified that "[t]here wouldn't be any work" for such a person. Finally, Judge Markiewicz asked whether there would be any jobs for a person who would miss "one day out of five in a work week . . . . due to medical reasons." *Id*. at 986–87. Winn replied that there would not be. *Id*. at 987. McLaren's attorney did not have any additional questions or supplemental

records.

**D. Regulatory Framework for Determining Disability**

When a claimant alleges a disability and applies to receive Social Security benefits, the ALJ evaluates the claim using a sequential five step process. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determines whether the applicant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). Substantial gainful activity is "work activity that involves doing significant physical or mental activities . . . that the claimant does for pay or profit." 20 C.F.R. § 220.141(a)–(b). If the claimant is engaging in such activities, the claimant is not disabled; if not, the evaluation continues at step two.

At step two, the ALJ considers whether the claimant has a severe and medically determinable impairment. Impairments are severe when "there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not suffer from a severe impairment, she is not disabled; if she does have a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ turns to the Social Security Administration's listing of severe impairments (the "Listing"). *See* 20 C.F.R. § 404, subpt. P, app. 1. If the claimant's alleged impairment meets one of the entries in the Listing, the claimant is disabled. If not, the ALJ moves to step four.

At step four, the ALJ assesses the claimant's residual functional capacity, or RFC, to assess whether the claimant could perform her past relevant work. 20 C.F.R. § 404.1520(a)(1). The RFC is a determination of "the most [the claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1520(a)(1). The ALJ considers past relevant work to be "work that [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how do to it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, she is not disabled; if she is not able to perform such past relevant work, the ALJ continues to step five. In the case of claimants who are fifty-five or older, are restricted to sedentary work, have no transferable skills, and have not completed any relevant vocational education, the Commissioner will usually not offer any evidence of work

meeting the claimant's RFC and the ALJ will decide disability based on the claimant's ability to perform past work. 20 C.F.R. § 404, subpt. P, app. 2 § 201.00(d).

At the fifth and final step, the burden shifts from the claimant to prove disability to the Commissioner to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (citing *Johnson v.* Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995)). If the Commissioner is able to identify such work, then the claimant is not disabled; if not, the claimant is disabled and entitled to benefits. 20 C.F.R. § 404.1520(g)(1).

**E. Judge Markiewicz's Decision**

Because McLaren claims a closed period of disability, Judge Markiewicz confirmed that "the only period at issue is from August 1, 2011 through December 31, 2013." *Id*. at 944 (emphasis in original). Judge Markiewicz assessed McLaren's residual functional capacity as the ability to:

> [p]erform light work as defined in 20 CFR 404.1567(b) except the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk for 4 hours in an 8-hour workday; is not limited in sitting; cannot climb ladders, rope, or scaffold; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can perform occasional overhead reaching with the left upper extremity; and should avoid concentrated exposure to extreme cold.

*Id*. at 947. First, Judge Markiewicz found that McLaren's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that her "statements concerning the intensity, persistence and limiting effects of [these] symptoms" were inconsistent with the medical evidence. *Id*. at 948. Judge Markiewicz characterized McLaren's treatment as "conservative[]," *id*., pointing to the opinions of the medical expert Dr. Schmitter, treating physician Dr. Mahdad, and examining physician Dr. Silbart. *Id*. Judge Markiewicz found conflicts between the December 9, 2009 MRI, which showed "rotator cuff tendonitis and/or incomplete undersurface tear and degenerative change with impingement" and the x-rays Dr. Silbart took at his office on February 23, 2010, which Judge Markiewicz described as "unremarkable." *Id*. at 949 (citing *id*. at 359). In addition, Judge Markiewicz wrote:

> Although Dr. Bhatia's narrative noted that the MRI of the lumbar spine, dated August 5, 2011, showed moderate to severe degenerative disk disease . . . the actual MRI report indicated only moderate multilevel degenerative disc disease. In addition, a subsequent MRI of the lumbar spine, dated April 12, 2012, revealed only minimal degenerative changes of the lumbar spine at L3-4 and moderate narrowing of the disk space at L5-S1.

*Id*. at 949–50 (internal citations omitted). He further noted that Dr. Bhatia's treatment notes indicated that McLaren was making progress in physical therapy and exhibiting normal strength and range of motion. *Id*. at 950.

When evaluating McLaren's credibility and the consistency of her testimony with the record, Judge Markiewicz found her not credible and her testimony inconsistent. "Despite the claimant's '7 out of 10' pain," he opined, "the claimant received relatively conservative treatment. For example, there is no evidence of use of narcotic-based medications." *Id*. at 951. He also noted that "the progress notes from the treating physicians are devoid of the claimant's asserted side effects from the medications." *Id*. He further found that Dr. Bhatia's reports that McLaren attended physical therapy once a week, worked out at home every day, and went to the gym three or four times per week were inconsistent with McLaren's testimony of symptoms and severity. *Id*. Judge Markiewicz rejected Dr. Mahdad's contention that McLaren "is considered Temporarily Totally Disabled" because "TDD" is a definition that comes from Worker's Compensation, not Social Security, and Dr. Mahdad appeared to have defined the term as indicating only that McLaren could not return to her past work as a nurse. *Id*. (citing *id.* at 556).

Judge Markiewicz gave "little weight" to Dr. Bhatia's opinion because Dr. Bhatia's records were both inconsistent and unclear. He explained:

> Dr. Bhatia initially did not provide any physical restrictions but deferred the issue of disability to a QME (qualified medical examiner). However, later in the same month, Dr. Bhatia imposed the following limitations: no sitting or standing more than 30 minutes to 1 hour; no lifting, pushing or pulling more than 8-10 pounds; and no repetitive twisting and bending. . . . Although Dr. Bhatia indicated the claimant cannot sit or stand more than 30 minutes to 1 hour, it is not clear whether this is at one time or in an 8 hour work day . . . . In addition, by October 2013, his own physical examination was essentially unremarkable with normal posture, normal gait, some tenderness to shoulder joint, 5/5 muscle strength, and negative straight leg raise bilaterally.

*Id.* at 952 (internal citations omitted). In forming his RFC, Judge Markiewicz afforded "great weight to the opinions of the impartial medical expert, Eric Schmitter, M.D." *Id*. at 948. Judge Markiewicz also considered the opinion of state agency physician Dr. F. Chan, who "opined that the claimant can perform generally light work with occasional to frequent postural limitations." *Id*. at 951. Judge Markiewicz limited his consideration of Dr. Chan's opinion to "the extent that it is consistent with Dr. Schmitter's opinions, who had the opportunity to review the entire medical evidence prior to his testimony." *Id*. Judge Markiewicz found that McLaren's RFC allowed her to perform:

> light work as defined in in 20 CFR 404.1567(b) except the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk for 4 hours in an 8-hour workday; is not limited in sitting; cannot climb ladders, rope, or scaffold; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can perform occasional overhead reaching with the left upper extremity; and should avoid concentrated exposure to extreme cold.

*Id*. at 947.

Judge Markiewicz then turned his attention to the hearing testimony of the vocational expert Kelly Winn, which he stated was consistent with the Dictionary of Occupational Titles (the "DOT"). *Id*. at 953. Based on that testimony, Judge Markiewicz concluded that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and was therefore not disabled during the period in question. *Id*.

**F. The Parties' Arguments**

In her Motion for Summary Judgement (Pl.'s Mot., dkt. 18), McLaren argues that Judge Markiewicz's finding that McLaren's testimony about her subjective symptoms was not credible is not supported by specific, clear and convincing reasons. Pl.'s Mot. at 12 (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). She further argues that Judge Markiewicz erred when he disregarded the opinion of her treating orthopedist Dr. Bhatia and instead relied on the testimony of the medical expert, who had not examined her. *Id*. at 1. She further contends that Judge Markiewicz did not provide specific and legitimate reasons for basing his RFC determination on the testimony of non-examining physician Dr. Schmitter. *Id*. at 3–4.

**1. Credibility Determination**

McLaren contends that none of the five reasons the ALJ provided for dismissing her subjective testimony meet the Ninth Circuit's clear and convincing standard. First, McLaren disputes Judge Markiewicz's description of her treatment as conservative. *Id*. at 13. She disputes Judge Markiewicz's assertion that "there is no evidence of use of narcotic-based medications," AR at 951, by pointing to her use of Butrans, a morphine-based medication that is considered a narcotic. *Id*. at 13 (citing AR at 40). McLaren further argues that, in the Ninth Circuit, "conservative treatment alone does not constitute substantial evidence to diminish a claimant's credibility." *Id*. (citing *Trevizo v. Berryhill*, 871 F.3d 664, 683 n.8 (9th Cir. 2017)). McLaren asserts that Judge Markiewicz's contention that her testimony was not credible because she had not undergone any orthopedic surgeries or had such surgeries recommended was inaccurate because Dr. Oakes had recommended a left hip replacement, which McLaren declined because of her relatively young age for the procedure. *Id*.

McLaren further argues that Judge Markiewicz's third reason for dismissing her subjective symptom testimony—her participation in physical therapy—is erroneous as a matter of law because activities of physical therapy are not transferable to a work setting, *see Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989), and because Judge Markiewicz did not address whether physical therapy activities, which he described as undermining her credibility, "consumed a substantial part of Ms. McLaren's day." Pl.'s Mot. at 15 (citing *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). In addition, she disputes Judge Markiewicz's fourth reason—that the MRI and physical examination findings were mild—by pointing to places in the record documenting pain and reduced range of motion, as well as places where "the MRIs and x-rays documented moderate foraminal stenosis and degenerative disc disease of the lumbar spine [and] x-rays documented moderate to severe degenerative joint disease of the left hip." *Id*. at 15 (internal citations omitted). McLaren dismisses Judge Markiewicz's final reason—that the medication side effects McLaren testified to are not documented in the record—by saying "[t]here was no reason to disbelieve Ms. McLaren's testimony, and her testimony as to medication side effects should be taken as true." *Id*. at 15–16.

The Commissioner asserts that Judge Markiewicz provided reasons that were "properly supported by the record and sufficiently specific to ensure a reviewing court that the ALJ did not 'arbitrarily discredit' the claimant." Comm'r's Mot. (dkt. 21) at 5 (quoting *Thomas v. Barnhart*, 278 F.3d 948, 958 (9th Cir. 2002)). He contends that Judge Markiewicz's reasons—conservative treatment, lack of orthopedic surgery, inconsistent statements about McLaren's daily activities, lack of objective evidence corroborating her testimony, and lack of documentation of medication side effects—are supported by substantial evidence and are therefore legitimate, clear, and convincing. *Id*. at 6–7.

In response to the Commissioner's motion, McLaren asserts that Judge Markiewicz's determination of her credibility was inconsistent with the record. Reply (dkt. 22) at 3. Specifically, she disputes Judge Markiewicz's characterization of her treatment as conservative (noting again that she tried a narcotic pain medication) and reasserts that the reason she did not undergo surgery on her hip was because *she* declined it, not because the doctor did not think her case was severe enough to warrant it. *Id*. at 3–4. The Commissioner, she argues, has not shown that Judge Markiewicz's determination of her credibility was supported by substantial evidence.

**2. Rejecting Dr. Bhatia's Opinion and Accepting Medical Expert Testimony**

McLaren also argues that Judge Markiewicz "erred in disregarding the opinions of Ms. McLaren's treating orthopedist, Dr. Bhatia, in favor of the opinion of Dr. Schmitter, the medical expert that testified at her hearing on remand. Pl.'s Mot. at 3. According to McLaren, Judge Markiewicz was required to give specific, legitimate reasons, supported by the record, for giving little weight to Dr. Bhatia's opinion of McLaren's RFC. *Id*. at 3–4 (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995); *Orr v. Astrue*, 495 F.3d 695, 632 (9th Cir. 2007)). She claims that Judge Markiewicz's "reasons for rejecting Dr. Bhatia's opinions were specific, [but] they were not 'legitimate' as his reasons were not supported by substantial evidence. In rejecting Dr. Bhatia's opinions, the ALJ mischaracterized the medical evidence and cherry-picked the portions of the evidence that supported his conclusions." *Id*. at 4. McLaren argues that Judge Markiewicz cited places in the record that he claimed conflicted with Dr. Bhatia's RFC opinion, but that he mischaracterized the records and "fail[ed] to explain how these findings do not support Dr.

Bhatia's opinion." *Id*. at 5. In addition, she claims that the single day of Dr. Bhatia's treatment notes that Judge Markiewicz focused on as inconsistent with his RFC opinion was "improperly cherrypicked" and that "evaluating the treatment notes as a whole . . . support[s] Dr. Bhatia's opinions, documenting a painful medical condition characterized by flareups and improvements." *Id*. at 5–6.

Additionally, McLaren asserts that Judge Markiewicz erred by relying on the testimony of Dr. Schmitter, the non-examining medical expert. She argues that Dr. Schmitter did not accurately characterize records from Dr. Oakes and ignored evidence supporting McLaren's complaints about back pain, and that Dr. Schmitter's "testimony is undercut by his assertion that the medical records did not document an intolerance to non-steroidal anti-inflammatory medication when in fact the medical records do." *Id*. at 10–11 (citing AR at 1186).

The Commissioner defends Judge Markiewicz's decision to discount Dr. Bhatia's testimony because of internal inconsistences within his own treatment records and because his findings are contradicted by other sources who examined McLaren during the same period. Comm'r's Mot. at 2–3. These discrepancies, Commissioner argues, constitute substantial evidence which meets the Ninth Circuit's clear and convincing standard. *Id*. at 3 & n.3. The Commissioner argues that when, as here, there are conflicts between medical sources, "'the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence,'" *id.* at 2 (quoting *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008)), and that "'[i]f the record would support more than one rational interpretation, [the court] defer[s] to the ALJ's decision,'" *id*. (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005)).

McLaren counters by claiming that that "Defendant and the ALJ mischaracterize and cherry pick the evidence to buttress the ALJ's rejection of Dr. Bhatia's opinion" and that a more detailed, accurate understanding of the record supports Dr. Bhatia's findings. Reply at 1–3. Finally, McLaren contends that her testimony regarding her daily activities is not inconsistent with Dr. Bhatia's opinion or with the rest of the record as a whole. *Id*. at 4.

## III. ANALYSIS

### A. Legal Standard

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401. (1971). "'Substantial evidence' means more than a mere scintilla," *id*., but "less than preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655. (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

The legal standard for rejecting a claimant's testimony about her subjective symptoms as not credible or inconsistent requires "specific, clear and convincing" reasons. *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014). The legal standard for giving less than "great weight" to the opinion of a treating physician when it is contradicted by the opinion of another examining physician is "specific and legitimate reasons." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)). If the ALJ failed to meet these standards in his opinion, the court may find legal and reversible error. *See Benitez*, 573 F.2d at 655.

Although the Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely,"

*Garrison*, 759 F.3d at 1010, "harmless error analysis applies in the social security context." *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015). "[W]here the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether reconsideration is necessary. By contrast, where harmlessness is clear and not a borderline question, remand is not appropriate." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (footnotes, citations, and internal quotation marks omitted). If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison*, 759 F.3d 1019–21.

**B. The ALJ's Credibility Determination is Supported by Clear and Convincing Evidence**

McLaren primarily argues that Judge Markiewicz erred by not providing clear and convincing reasons for rejecting her testimony about the nature and intensity of her pain. However, the Court finds that Judge Markiewicz provided several reasons for finding that McLaren's statements about her symptoms are inconsistent with the record. The reasons are specific and supported by substantial evidence, and the Court finds them clear and convincing. Therefore, Judge Markiewicz did not err.

The ALJ is responsible for determining the claimant's credibility. *Magallanes*, 881 F.2d at 750. In the Ninth Circuit, an ALJ may deny a claim based on inconsistencies between the claimant's subjective pain testimony and the objective record when he provides "specific, clear and convincing reasons" for doing so. *Garrison*, 759 F.3d at 1014–15. Those reasons must be supported by substantial evidence, or "affirmative evidence" in the record. *Robbins*, 466 F.3d at 883.[8]

McLaren testified that her pain was severe and disabling during the closed period. *See generally* AR at 977–83 (McLaren's testimony at the remand hearing). Judge Markiewicz found that testimony "not entirely consistent with the medical evidence and other evidence in the

---

[8] The Commissioner objects to the Ninth Circuit's "clear and convincing reasons" standard to preserve the issue for appeal but acknowledges that this Court is bound by it. Comm'r's Mot. at 11 n.3.



United States District Court
Northern District of California

record." *Id*. at 948. He offered five specific reasons for finding McLaren's subjective pain testimony inconsistent with the record and therefore not credible: her conservative treatment plan, lack of orthopedic surgery, inconsistent reports of activities of daily living, inconsistencies between McLaren's testimony and the objective evidence, and lack of support in the record for McLaren's alleged side effects. *Id*. at 951.

For the reasons described below, each of the pieces of evidence Judge Markiewicz cited to support his finding that McLaren's testimony was not credible is supported by substantial evidence in the record. Accordingly, taking all the substantial evidence Judge Markiewicz offered leads the Court to conclude that his overall finding was supported by clear and convincing evidence. Therefore, Judge Markiewicz did not err in finding McLaren's subjective pain testimony not credible and inconsistent with the record.

**1. Conservative Treatment Plan**

McLaren claims that Judge Markiewicz erred when he pointed to her conservative treatment plan as a reason for finding her testimony inconsistent with the record. The issue here is whether Judge Markiewicz's inference that McLaren's treatment was conservative is supported by substantial evidence. The Court finds that it was.

While McLaren is correct that conservative treatment "is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment," *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008), the Ninth Circuit has held that "evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) ("Meanel's claim that she experienced pain approaching the highest level imaginable was inconsistent with the 'minimal, conservative treatment' that she received."). This is especially true when, as here, the record indicates that the claimant responded well to that treatment. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) ("The record reflects that Tommasetti responded favorably to conservative treatment . . . . Such a response to conservative treatment undermines Tommasetti's reports regarding the



United States District Court
Northern District of California

disabling nature of his pain.”). The record supports Judge Markiewicz’s inference that the conservative treatment in the record—which included only limited medication and did not include surgery—indicated a mildness that is at odds with the severity McLaren described in her testimony.

McLaren also claims that Judge Markiewicz discounted the fact that she was taking Butrans, a narcotic drug, and asserts that this drug and the Botox injections she received indicate that her treatment was not conservative. *See* Mot. at 13; Reply at 3–4; AR at 18. However, McLaren first testified that she took Butrans in December of 2013: the month in which her disability ended. *See* AR at 40; *see also id.* at 1233 (records from February of 2014—after McLaren returned to work—including Butrans in her list of medications). McLaren did not receive Botox injections until May of 2014. *Id*. at 1211. When McLaren received this more intensive treatment, or at least shortly thereafter, she was able to work at a level meeting the standard for substantial gainful activity.

In addition, McLaren’s doctors consistently referred to her course of pain medication and physical therapy as “conservative treatment.” *See, e.g.*, *id.* at 641 (“At this point, the patient appears to have a slight improvement in her symptoms with physical therapy and conservative treatment with Lyrica and the Lidoderm patches.”). They also postponed or forewent more invasive procedures given the success of that treatment. *See id.* at 659 (“I think the ultimate treatment would be a left total hip arthroplasty when she feels ready.”); *see also id*. at 641 (“For the lumbar spine, the patient may need to undergo surgical interventions for lumbar fusion at L5-S1 sometimes [sic] in the future, but for now we will have her continued on conservative treatment.”). Based on the record during the closed period before McLaren returned to work, Judge Markiewicz’s description of McLaren’s treatment as “conservative” is supported by substantial evidence.

Because the Ninth Circuit has repeatedly affirmed that ALJs may use evidence of conservative treatment—in conjunction with other evidence, and in the absence of a good reason for not seeking more intensive treatment—to support an inference of adverse credibility and inconsistency, and because the record supports Judge Markiewicz’s finding of conservative

treatment, the Court finds his reasoning supported by substantial evidence in the record.

**2. Lack of Need for Orthopedic Surgery**

McLaren further claims that Judge Markiewicz's reasoning that McLaren was not recommended orthopedic surgery "simply is not true," because "Dr. Oakes recommended a left hip replacement, but Ms. McLaren did not feel ready to undergo the procedure due to her young age." Pl.'s Mot. at 13. The Court must decide whether Judge Markiewicz's interpretation of the record evidence regarding McLaren's need for surgery is supported by substantial evidence. The Court finds that it is.

The parties offer two different interpretations of the record regarding McLaren's need for orthopedic surgery on her hip. McLaren says that her doctors did recommend surgery but did not proceed only because she, not they, felt she was not ready. Pl.'s Mot. at 13. The Commissioner reads the record to reflect that doctors were planning to resort to surgery only if McLaren did not improve with physical therapy; her improvement made surgery unnecessary and reports to the contrary indicate that that McLaren exaggerated her condition. Comm'r's Mot. at 6. The ALJ sided with the Commissioner, finding that McLaren having "no orthopedic surgeries nor any of the doctors recommend[ing] orthopedic surgeries" was a reason that McLaren's testimony regarding the intensity of her symptoms was inconsistent with the medical evidence. AR at 951.

When, as here, there are conflicting readings of the same evidence in the record, the Court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Magallanes*, 881 F.2d at 750; *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (citing *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)). The record indicates that professionals at the FRP described surgery as "only optional," AR at 688, and that the surgeon referred to surgery as "ultimate treatment" but expressed satisfaction at McLaren's progress with physical therapy, *id.* at 659. In fact, Dr. Oakes left the option of surgery entirely up to McLaren. *Id*. at 659, 665. It is a reasonable interpretation of the evidence that leaving the choice up to the patient pending results of more conservative treatment like physical therapy indicates that the patient's condition is not so severe as to require surgery. It is also a reasonable interpretation of the evidence to conclude that the phrase "ultimate treatment,"



United States District Court
Northern District of California

*id*. at 659, means that the patient will require surgery sometime in the future, but not at present. Because Judge Markiewicz's interpretation of the record regarding surgery is a rational interpretation of the evidence in the record, the Court cannot reverse the ALJ on these grounds.

McLaren argues that the ALJ factually erred when he said that no doctor has recommended orthopedic surgery, because "Dr. Oakes clearly indicated that Ms. McLaren was a candidate for left total hip replacement when she was ready." Reply at 4 (citing AR at 665). To the extent that Judge Markiewicz may have erred in failing to reflect the nuance Dr. Oakes's recommendation, the error is harmless. Ninth Circuit precedent has "long recognized that harmless error principles apply in the Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (citing *Stout v. Comm'r*, *Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006)). A reviewing court "must analyze harmlessness 'in light of the circumstances of the case.' The application of the harmless error analysis is "fact-intensive"; courts "must analyze harmlessness in light of the circumstances of the case." *Marsh*, 792 F.3d at 1172 (quoting *Molina*, 674 F.3d at 1121).

While Dr. Oakes initially considered McLaren a candidate for hip surgery and considered improvement with physical therapy "unlikely," AR at 665, he later noted that he was encouraged by McLaren's progress with physical therapy, *id.* at 659. Even at the first visit, Dr. Oakes deferred to McLaren's preference to forego surgery, at least for the time being. *Id.* at 665. Dr. Oakes's prognosis also turned out to be incorrect—the fact remains that McLaren did not undergo surgery, and she was nevertheless able to return to her previous work as a nurse, at levels constituting substantial gainful activity. There is no reason to believe that Judge Markiewicz would have assessed McLaren's credibility differently if he had noted more accurately that Dr. Oakes initially recommended surgery but that McLaren never received surgery before returning to work.

Moreover, where "the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record . . . . an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion.'" *Molina*, 674 F.3d at 1115 (quoting *Batson v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1197 (9th Cir. 2004)). Here, even if the Court were to find that McLaren's lack of surgical treatment was not a valid reason to



United States District Court
Northern District of California

consider her pain testimony not fully credible, the Court would still find Judge Markiewicz's overall conclusion—that McLaren's testimony was not consistent with the record and, consequently, the record indicates that she was not disabled during the period in question—valid because Judge Markiewicz provided additional clear and convincing reasons which are supported by substantial evidence. The error would not negate the validity of Judge Markiewicz's overall conclusion.

**3. Inconsistent Reports of Activities of Daily Living**

McLaren also claims that the ALJ erred as a matter of law by pointing to her activities of daily living as evidence that her testimony was not credible. The Court must decide whether Judge Markiewicz's inference that McLaren's activities of daily living were inconsistent with her testimony is supported by substantial evidence. The Court finds that it is.

While the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day," *Garrison*, 759 F.3d at 1016, the ALJ offered such evidence not to prove that McLaren's daily activities would have allowed her to work but to point to inconsistencies between what McLaren testified to at her remand hearing and what the record indicated about her activity level. The conclusion he came to—that McLaren was exaggerating her symptoms in her testimony—is supported by substantial evidence.

At the remand hearing, McLaren testified that, during the period of her disability, she "would lie down with [her] leg up on the wall because of the pain" and that her activities outside the home were limited to grocery shopping. AR at 981. She testified that she could only stand for "20/30 minutes" and that walking was "agonizing." *Id*. at 982. The record directly conflicts with that testimony. For example, as Judge Markiewicz noted, McLaren reported to Dr. Bhatia that she was exercising at home every day, going to the gym three or four times per week, and occasionally swimming, which contradicts the testimony McLaren gave at the hearing that she did not leave her home except for grocery shopping and could only stand for up to half an hour at a time. *Id*. at 951



United States District Court
Northern District of California

(citing *id*. at 932). Other places in the record also conflict with her testimony. Most notably, McLaren attended a full-day, five-week Functional Restoration Program which included "two hours total time per day in the gym" doing physical therapy as well as attending group therapy and educational lectures. *Id*. at 692. During her time in the program, she consistently spent over half an hour on a treadmill. *Id*. at 695, 701, 719. The program's physical therapists consistently praised McLaren's progress and improved "overall level on conditional and exercise tolerance as well as flexibility and strength." *Id*. at 719. These records conflict with McLaren's testimony that she "couldn't even walk around the block." *Id*. at 982.

Because the discrepancies between McLaren's testimony about her daily activities and what the record indicates about her daily activities speak directly to the issue of credibility, and because the record contains substantial evidence indicating that McLaren's symptom testimony was exaggerated when compared to her reports of daily activities, the Court finds that Judge Markiewicz's conclusion that McLaren's testimony is inconsistent with the record to be supported by substantial evidence.

**4. MRI, X-Ray, and Other Objective Evidence**

McLaren claims that Judge Markiewicz committed reversible error by asserting that her subjective complaints were not corroborated by objective medical evidence. The Court must decide whether Judge Markiewicz appropriately used lack of objective medical evidence to infer that McLaren's testimony was inconsistent with the record and, by extension, whether the inference is supported by substantial evidence. The Court finds that Judge Markiewicz used lack of objective evidence appropriately and that his assertion that the objective evidence points to inconsistencies between McLaren's testimony and the record is supported by substantial evidence.

An ALJ does not necessarily err as a matter of law when he lists a lack of objective medical evidence supporting a claimant's testimony as a reason to discount her credibility. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Lack of objective evidence, when accompanied by sufficient reasoning and findings, is a permissible part of an ALJ's credibility determination. *Id*. Because Judge

Markiewicz appropriately considered a lack of objective evidence in conjunction with other reasons to discount McLaren's credibility, the only issue is whether Judge Markiewicz supported his inference that lack of objective medical evidence corroborating McLaren's pain testimony detracted from her credibility with substantial evidence. The Court concludes that he did.

First, Judge Markiewicz pointed to the November 19, 2013 lumbar MRI, which found degenerative disc disease and no other changes since the previous MRI on November 11, 2011, which indicated mild left side tears with disc bulging but no significant spinal stenosis or other findings. AR at 951 (citing *id*. at 701); *see also id.* at 1164–65 (describing MRI findings from November 19, 2013). Judge Markiewicz also noted that "Dr. Bhatia's clinical findings of normal posture, normal gait, 5/5 muscle strength, and negative straight leg raise bilaterally" were at odds with McLaren's testimony. *Id*. at 951; *see also id.* at 932 (Dr. Bhatia's findings from October 1, 2013). Those findings are representative of Dr. Bhatia's physical examinations overall. *See id*. at 629, 632, 635, 638, 641, 644, 647, 734, 737, 740, 743, 747, 750, 755, 759, 938 (documenting increasing muscle strength in the left hip flexors and 5-/5 to 5/5 muscle strength in all other areas). They are also consistent with Dr. Iskander's findings from the same time period. *See generally id*. at 590–624, 853–914 (Dr. Iskander's treatment notes from the claimed period of disability). These objective findings do not support McLaren's testimony of disabling symptoms, and Judge Markiewicz did not err in considering that lack of support in conjunction with other reasons for discounting McLaren's testimony.

**5. Lack of Support for Claims of Medication Side Effects**

Finally, McLaren claims that Lyrica caused dizziness, which added to her disability and prevented her from working. Judge Markiewicz dismissed this testimony because "the progress notes from the treating physicians are devoid of the claimant's asserted side effects from the medications." AR at 951. An ALJ may infer the absence of a symptom from the its absence in the record. *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (upholding a hypothetical that excluded fatigue as a side effect because the record did not reflect that the claimant reported fatigue to his doctors). Here, the only mention of dizziness in the record comes from McLaren herself on one questionnaire. AR at 317. Treatment records do not document that McLaren was

experiencing dizziness from Lyrica or any other medication. Not only does the record not mention side effects, but Dr. Iskander's review of symptoms notes during McLaren's visits invariably indicate that she experienced "no dizziness" while taking Lyrica. *See id*. at 598, 604, 610, 616, 621, 861, 866, 872, 878, 883, 889, 894, 899, 905, 910, 1242 (treatment notes from Dr. Iskander where McLaren reported no dizziness despite taking Lyrica). McLaren also told Dr. Iskander that she was having "good results" with Lyrica and wanted to increase the dose. *Id*. at 859. Because the record not only does not support but contradicts McLaren's report of dizziness as a side effect of taking Lyrica, this reason is supported by substantial evidence.

* * *

In finding McLaren's subjective symptom testimony less than credible, Judge Markiewicz offered five specific reasons, each of which is supported by substantial evidence in the record. Therefore, the Court finds that Judge Markiewicz provided legitimate, clear and convincing reasons for finding that McLaren's statements about her symptoms was inconsistent with the evidence in the administrative record and, accordingly, did not err.

**C. The ALJ Provided Specific and Legitimate Reasons to Discount Dr. Bhatia's Opinion Regarding McLaren's Physical Limitations**

McLaren also argues that Judge Markiewicz committed reversible error when he discounted the opinion of Dr. Bhatia, McLaren's treating physician, in forming his RFC finding. She further asserts that Judge Markiewicz erred when he relied on the testimony of Dr. Schmitter, a non-examining physician who testified at her hearing, instead of Dr. Bhatia's opinion. Because Judge Markiewicz provided specific and legitimate reasons, supported by substantial evidence, for dismissing Dr. Bhatia's opinion, and because he did not rely on Dr. Schmitter's testimony alone in making his RFC determination, the Court finds that Judge Markiewicz did not err.

**1. Rejecting Treating Physician Dr. Bhatia's Opinion**

In forming his judgment of McLaren's RFC, Judge Markiewicz gave Dr. Bhatia's opinions "little weight":

> Although Dr. Bhatia indicated the claimant cannot sit or stand more than 30 minutes to 1 hour, it is not clear whether this is at one time or in an 8 hour work day. If this limitations [sic] apply during the 8 hour



United States District Court
Northern District of California

> work day, his opinions are not well supported since the recent MRI of the lumbar spine dated November 19, 2013, demonstrated only minimal to mild stenosis and degenerative face [sic, presumably "facet"] disease with small disc bulge, which is not changed from the prior examination on November 7, 2011 [AR at 1164–65]. In addition, by October 2013, his own physical examination was essentially unremarkable with normal posture, normal gait, some tenderness to shoulder joint, 5/5 muscle strength, and negative straight leg raise bilaterally [AR at 932]. Therefore, the opinions of Dr. Bhatia are given little weight.

*Id*. at 952. Instead, he found that McLaren could perform:

> light work as defined in 20 CFR 404.1567(b) except the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk for 4 hours in an 8-hour workday; is not limited in sitting; cannot climb ladders, rope, or scaffold; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can perform occasional overhead reaching with the left upper extremity; and should avoid concentrated exposure to extreme cold.

*Id*. at 947. Judge Markiewicz went on to opine that his "residual functional capacity assessment is supported by the entire medical evidence and the claimant's inconsistent statements," *id*. at 952, and that McLaren was not disabled. McLaren asserts that Judge Markiewicz's offered reasons were specific but not legitimate because they were not supported by the record. Pl.'s Mot. at 4.

Ordinarily, Dr. Bhatia's opinion would be entitled to great weight; the Ninth Circuit "afford[s] greater weight to a treating physician's opinion because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). If the treating physician's opinion is contradicted by another doctor, the ALJ must give specific and legitimate reasons for departing from the treating physician's opinion. *Id*. (citing *Murray*, 722 F.2d at 502).

Here, Judge Markiewicz explained that Dr. Bhatia's physical limitation assessment was contradicted by other sources—most notably, but not limited to, medical expert Dr. Schmitter, who reviewed the record and testified at the hearing that McLaren had an RFC substantially similar to that assessed by Judge Markiewicz. *See* AR at 948 (citing Dr. Schmitter's testimony as the primary basis for McLaren's RFC). Dr. Schmitter's opinion that McLaren could stand and walk for four hours in an eight-hour day is at odds with Dr. Bhatia's assertion that McLaren had limitations in standing for more than half an hour to an hour. *See id.* at 969 (Dr. Schmitter's

testimony). Because Dr. Bhatia's opinion is controverted by other medical sources, the Court must decide whether Judge Markiewicz gave specific and legitimate reasons for rejecting Dr. Bhatia's opinion that McLaren should was limited to "no sitting or standing more than 30 minutes to 1 hour; no lifting, pushing, or pulling more than 8-10 pounds; and no repetitive twisting or bending." *Id*. at 952 (citing *id*. at 935).

Judge Markiewicz identified two such reasons: first, he found Dr. Bhatia's assessment of McLaren's physical restrictions was "not well supported" by the objective evidence in the record, including MRIs in November of 2011 and 2013. *Id*. at 952. In addition, Judge Markiewicz noted that Dr. Bhatia's opinion about McLaren's functional limitations was inconsistent with his own internal treatment notes about her progress. *Id*. The Court finds that these reasons are supported by substantial evidence in the record and, therefore, that Judge Markiewicz provided specific and legitimate reasons for giving Dr. Bhatia's assessment of McLaren's physical limitations "little weight." *Id*. at 951.

Judge Markiewicz first noted that Dr. Bhatia's opinions regarding McLaren's purportedly severe limitations as to sitting and standing because the November 13, 2013 and November 9, 2011 MRIs of McLaren's lumbar spine indicated only "minimal to mild stenosis and degenerative face[t] disease with small disk bulge." *Id*. at 952; *see also id*. at 1164–65 (finding a 3 millimeter extension, which the radiologist described as "minimal," and two other disc bulges between 2 and 3 millimeters in size on November 19, 2013). Judge Markiewicz then compared Dr. Bhatia's narrative assessment of the MRI, in which Dr. Bhatia claimed that McLaren suffered from "moderate to severe degenerative disk disease," with the "actual MRI report," which noted that the degenerative disk disease was "only moderate." *Id*. at 949–50 (citing *id*. at 925). According to Judge Markiewicz, the record does not support Dr. Bhatia's assessment and instead supports the description written by the radiologist, which in turn does not support Dr. Bhatia's limitations.

The November 2013 MRI's finding as summarized in the radiologist's report is supported by the record. The characterization of the MRI results as "moderate" is consistent with the conclusions of the other imaging evidence in the record. An MRI from August 22, 2011 described McLaren's spinal canal stenosis as "mild-to-moderate." *Id*. at 555. X-ray findings characterized



United States District Court
Northern District of California

McLaren's condition similarly. An x-ray dated April 12, 2012 found only "minimal degenerative changes," although it also found "significant hip joint space narrowing." *Id*. at 564. Another x-ray from July 18, 2012 noted only "mild left hip osteoarthrosis." *Id*. at 562. In addition, as Judge Markiewicz pointed out, an x-ray from Dr. Silbart's office found "normal lumbar spine and moderate narrowing at the left hip." *Id*. at 950–51 (citing *id*. at 843–47). The radiologist's description of the MRI and the inference Judge Markiewicz drew from it—that McLaren's symptoms were not severe enough to warrant a thirty-minute to one-hour limit on standing during an eight-hour work day—are supported by substantial evidence in the record. Because the other imaging studies in the record support the moderate description of McLaren's condition reflected in the original MRI report, rather than Dr. Bhatia's description of it as moderate-to-severe, the Court finds that Judge Markiewicz's decision to rely on it is supported by the record.

Judge Markiewicz also explained that Dr. Bhatia's proffered opinion conflicted with other clinicians' findings in the record and with Dr. Bhatia's own clinical findings. Judge Markiewicz pointed to Dr. Bhatia's own physical examinations finding "normal posture, normal gait, some tenderness to the shoulder joint, 5/5 muscle strength, and negative straight leg raise bilaterally" as inconsistent with the limitations he described days later. *Id*. at 952 (citing *id*. at 932). In addition, Judge Markiewicz noted that Dr. Bhatia's assessment that McLaren was "temporarily totally disabled" was at odds with his consistently noting that McLaren had "normal posture, slight antalgic gait, decreased range of motion, 5/5 muscle strength, negative straight leg raise, and intact sensation." *Id*. at 950 (citing *id*. at 638, 635–36, 632, 629, 921).

The October 2013 note that Judge Markiewicz pointed to is representative of Dr. Bhatia's physical examinations and treatment notes overall. *See* AR at 629, 632, 635, 638, 641, 644, 647, 734, 737, 740, 743, 747, 750, 755, 759, 938 (documenting increasing muscle strength in the left hip flexors and 5-/5 to 5/5 muscle strength in all other areas); *see also id.* at 950 (citing places where Dr. Bhatia's notes found the above). In addition, other examining treatment providers' findings during that same time period echo Dr. Bhatia's findings from the October visit. Dr. Silbart, for example, found that McLaren had intact sensation and 5/5 muscle strength "in all tested lower extremity motor groups" on September 4, 2012. *Id*. at 844–45. Dr. Oakes also found



United States District Court
Northern District of California

5/5 "lower extremity" strength and "intact light touch and palpable pulses" on July 18 and October 17, 2012. *Id*. at 659, 665. On McLaren's final day of the FRP program, her physical therapist reported "5/5 of motor function of upper extremities." *Id*. at 720. Dr. Iskander also documented similar findings during the same time period. *See generally id*. at 590–624, 853–914 (documenting 5/5 right motor strength and 4/5 left motor strength in the lower extremities). Because the result upon which Judge Markiewicz relied when determining that Dr. Bhatia's internal treatment notes were inconsistent with his opinion is supported by the record, the Court finds this reason is legitimate.

Because Judge Markiewicz offered reasons, supported by the record, to give little weight to Dr. Bhatia's testimony, the Court finds that Judge Markiewicz provided specific and legitimate reasons and therefore did not err.

**2. Reliance on Non-Examining Physician Dr. Schmitter's Opinion**

McLaren further alleges that Judge Markiewicz committed reversable error by relying on the opinion of Dr. Schmitter, the non-examining medical expert at McLaren's second hearing, who opined that McLaren could stand and walk for four hours of an eight-hour day, had no push/pull limitations, should not "be on ladders, ropes or scaffolds at all," and could lift twenty pounds frequently and ten pounds occasionally[9] with no other physical limitations. *Id*. at 969–70. This assessment formed the basis for Judge Markiewicz's assessment of McLaren's RFC. *See id*. at 948.

"[O]pinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Morgan*, 169 F.3d at 600. Dr. Schmitter's opinion meets that standard. For example, Dr. Schmitter's assertion that McLaren's knees were "normal" is supported by examination records. *Id*. at 967; *see also id*. at 356–58, 844–46 (finding from Dr. Silbart of 5/5 muscle strength in lower extremities and full range of motion in both knees at two separate exams); 659, 665 (finding from

[9] Dr. Schmitter likely misspoke in stating that McLaren could lift a heavier weight frequently than she could lift occasionally. Judge Markiewicz eventually decided that McLaren could lift ten pounds frequently and twenty occasionally. AR at 947.

Dr. Oakes of 5/5 lower extremity strength); 720 (finding from FRP physical therapist of 5/5 of motor function of upper extremities). His assessment that her spine was "within normal limits" but showed "degeneration" was supported by x-ray evidence. *See id*. at 562 (noting that an x-ray of McLaren's spine showed ""mild generalized osteopenia"); *id.* at 757 (noting that an x-ray found "minimal degenerative changes"); *id.* at 846 (finding only "[c]ongenital narrowing . . . with no hypertrophic change" as the only abnormality in McLaren's lumbosacral spine).

Furthermore, Dr. Schmitter's assessment that McLaren would have not have "any limitations in sitting," *id*. at 969, is supported by Dr. Silbart's finding that McLaren was "able to sit comfortably with hip flexed to 90˚." *Id*. at 845. His finding that McLaren could stand and walk for four hours out of an eight hour day, *id*., is supported by Dr. Silbart's finding that "[t]he patient is able to toe and heel walk easily" and could "ambulate without an antalgic gait," *id*. at 812, and FRP documentation that McLaren could walk on the treadmill for up to forty minutes in a single therapy session. *Id*. at 719. Finally, his assessment that McLaren is capable of light lifting and carrying is supported by Dr. Silbart's finding of full range of motion in both McLaren's shoulders and five out of five upper extremity muscle strength. *Id*. at 843–44. Because substantial evidence in the record supports Dr. Schmitter's opinion, Judge Markiewicz did not err in relying on it when forming his RFC determination.

The purported errors by Dr. Schmitter that McLaren identifies in her motion are, for the most part, merely differing reasonable interpretations of the evidence in the record. *See* Pl.'s Mot. at 10–11. Dr. Schmitter's contention that Dr. Oakes did not think McLaren's condition was severe enough for surgery at the time that he examined her, AR at 967, is a reasonable interpretation of Dr. Oakes's note that McLaren would need surgery when she was ready for it. In addition, McLaren's assertion that Dr. Schmitter claimed she "did not have a back impairment" is inaccurate. *Id*. at 11. Dr. Schmitter acknowledged that McLaren's conditions would "[o]f course" cause pain. AR at 974. He also noted that imaging studies "show some abnormality," but attributed it to McLaren's age. *Id*. at 972–74. His statements that her spine x-rays were "normal," and that her "complaints of back pain are not well substantiated," *id*. at 967, 970, is an accurate reflection of the x-ray reports, which described McLaren's spine as normal and her condition as

mild. *See id*. at 562–64, 757, 846.

Finally, Dr. Schmitter's skepticism regarding McLaren's claimed allergy to certain pain medications, *id*. at 974, reflects the lack of objective evidence in the record supporting that claim. McLaren wrote that she suffered "an anaphalactic [sic] allergic reaction to Motrin 12/10/2010,"[10] *id*. at 267, but any further documentation of episode was not included in the record, nor are there any records from Dr. Cocke or the trip to the emergency room that McLaren described in her hearing testimony. *Id*. at 978–79. In a pain questionnaire dated December 16, 2010, McLaren claimed that Motrin, Naproxen, and "narcotic pain meds" made her nauseous, but she did not mention anaphylaxis. *Id*. at 232–34. Furthermore, notes from physical therapy during December of 2010 do not mention any "Adverse Drug Reactions" caused by anti-inflammatory medication. *See id*. at 531, 534, 537, 540 (listing only "Sulfa- rash" as an adverse drug reaction between December 15 and December 23, 2010). Other instances in the record during the time in question are sparse and, in some cases, self-reported. *See, e.g.*, *id*. at 497. Regardless, there is no indication that Dr. Schmitter's apparent rejection of the claimed allergy affected his assessment of McLaren's impairments and limitations, particularly given that McLaren never claimed to be allergic to all pain medication, and ultimately used medication such as Butrans when she returned to work.

Furthermore, Judge Markiewicz did not rely on Dr. Schmitter's opinion alone. He went on to cite opinions of examining physicians Dr. Mahdad and Dr. Silbart. *Id*. at 948–49. He also gave "partial weight" to the opinion of non-examining physician Dr. Chan, which he "only accepted to the extent that it is consistent with Dr. Schmitter's opinions" because Dr. Schmitter "had the opportunity to review the entire medical record," while Dr. Chan did not. *Id*. at 951. Dr. Schmitter's opinion is consistent with the opinions of the examining physicians on whose opinions Judge Markiewicz also relied.

Judge Markiewicz provided specific and legitimate reasons, supported by substantial

[10] Dr. Silbart's notes read that that the anaphylactic shock incident occurred on December 10 of 2012, not 2010. AR at 838. Given that McLaren described the incident in an exertional report dated November 20, 2011, *id*. at 265–67, this is likely an error.

evidence, for rejecting Dr. Bhatia's testimony. He also relied on several sources in addition to Dr. Schmitter's opinion, which was supported by substantial evidence. Accordingly, he did not err by discounting McLaren's treating physician or by relying on the opinion of a non-examining physician in forming his RFC determination.

## IV. CONCLUSION

For the reasons discussed above, the Commissioner's motion is GRANTED and McLaren's motion is DENIED. The Clerk is instructed to enter judgement in favor of the Commissioner and to close the file.

**IT IS SO ORDERED.**

Dated: December 27, 2019

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California